Good morning, everyone. The first argued case this morning is number 172618 ITG Voma Corporation against the International Trade Commission. Let's see. Mr. Stell, are you first? Proceed. May it please the Court. This appeal concerns the unlawful application by the United States International Trade Commission of the Trade Preferences Extension Act of 2015, or TPEA. The Congress passed the TPEA on June 29, 2015, as the Commission was in the final stages of its passenger vehicle and light truck tires from China final injury determinations. Are you arguing on appeal that there was an error here because the ITC didn't request comments about TPEA, or is that an argument that you no longer raise? Your Honor, I don't think this appeal is about whether the Commission requested comments. The question is whether the Commission applied the TPEA lawfully. And our position, Your Honor, is that it clearly did not. But what about the Doctrine of Exhaustion of Administrative Remedies? You had the opportunity to raise questions about the TPEA factors before the agency, and you didn't do that. You didn't file any comments about it. So why wouldn't that be a bar? Your Honor, there's a few factors here that are relevant. One is that the TPEA was passed on June 29, 2015. The Commission then, in its July 2nd report, indicated that it would not be applying the TPEA. The only opportunity that we had to provide comment, Your Honor, were comments on the factual record, which were due on July 10. In terms of the administrative exhaustion argument, Your Honor, as the Commission and my colleagues at the bar from the petitioner side pointed out, the petitioner actually raised the question of whether the TPEA was in fact applicable. Having raised it, that, Your Honor, thus satisfies the administrative exhaustion requirement. If you look, for example, Your Honor, at Zao King Tifo, a case before the CIT, it was exactly the same posture as this case. The petitioner in that case raised an issue, and that issue was decided upon by the agency. In that case, it was the Commerce Department. The respondent then raised that same issue on appeal, and the government argued, in fact, Your Honor, that there should be an exhaustion of remedies. And the CIT explained, citing several cases from both the D.C. Circuit and the Ninth Circuit, there was no exhaustion of administrative remedies, Your Honor. Okay, but you made, neither you nor anyone else made any argument as to how these factors should lead to a different result for the ITC in terms of material injury, right? No, Your Honor, but as I said, one of the parties... That's correct, isn't it? Yes, that's correct, Your Honor, but one of the parties did, in fact, say that the statute should apply. The statute required the Commission to evaluate five new impact factors, and those factors include the ability to service debt and also the question of the return on assets, Your Honor. That's critical, isn't it, as to whether it would have changed the result, because it was apparent that you were prepared. The legislation had been enacted. It had gone through both houses. It was ready for the President, and it was signed, and according to record, apparently you were prepared to respond to those aspects. However, in the end, they weren't relied on, but if you're not arguing that the result would have been different, would most likely have been different, then what are you asking for? No, Your Honor, I do think the result would have been different. Let me address you very clearly. Four of the five factors, there was, in fact, information on the record. Four of the factors that are new strongly favor our client's position, and we believe should have been addressed and addressed more fully. But you didn't argue that in your brief, did you? I mean, I don't see anything in your brief about how it would make a difference if they'd addressed these factors. That's not right, Your Honor. I don't know if you mean our briefs to the court or our briefs to the agency. Even at this late stage, in terms of the brief to this court, I don't see that you told us what difference it would make. No, I respectfully disagree, Your Honor. I think if you look at page 10 of our reply brief, we actually have a chart where we detail the four factors that I was just mentioning to Judge Newman. There was, in fact, information on the record. Three of the factors the commission addressed in a very cursory manner. They simply said it's not surprising. I don't think that gives your court a discernible path to understand how those three factors—net profits, gross profits, and operating profits—should have, in fact, impacted the commission's decision. With respect to the return on assets, Your Honor, that factor also strongly favors my client's position. It was nowhere addressed in the commission's decision. It was addressed in a footnote in the staff report, but there is nothing in the commission's decision itself that talks about that particular provision. So for the first time in the reply brief, you argued what difference it would make? No, Your Honor. I would point out that my colleague at the bar has had a separate brief in which he explained, I think in about 40 pages, Your Honor, how those same four factors strongly favored. We did not want to duplicate this court's time and effort. We strongly believe from the beginning— So in your opening brief, you didn't tell us what difference it made. We did, Your Honor. We said that all the factors strongly supported our position. We did not have exactly the detail that are laid out in the brief. Where did you say it in the blue brief? I believe I have a little time for rebuttal, Your Honor. I'll find that precise page for you. But we have consistently said that four of the five factors enumerated by Congress, the new factors, strongly favored our position. One factor—and I do want to make sure I hit this before my time ends on direct, Your Honor—the ability to service debt. There is no information on the record about that whatsoever. To answer Your Honor's question, the commission could have gone back and issued questionnaires, as we pointed out in our brief. They actually did that in this very case. They gave the parties five days to do that. They also could have, when we appealed the issue to the Court of National Trade, Your Honors, asked for a remand. They could have said, aha, now that we see that when we applied the new statute, we didn't have the time and we feel like we need more time to try to figure out how to apply these factors, they could have asked for a remand and gone back and done that. However, the agency elected not to do that. So just to be clear, before the ITC, you did not argue to them what difference these factors would have made? No, Your Honor, we did. We argued that four of five factors— I'm sorry, where do I find that? That would be in our final comments, Your Honor, that were submitted, for example, on July 10 to the commission. Where is that in the record? That is—I'll find the precise page for you—but that was submitted to the commission and also my colleague at the bar, the bulk of his argument— You can't identify, standing here, what page is that? Oh, is it in the appendix? Yes, Your Honor. Also, my colleague at the bar, his entire argument, Your Honor, is about the three profit factors and also about the return on assets. So, for four of the five factors, one factor there was no information whatsoever on the record. For four of the five factors, we strongly argued to the commission and then again to the CIT and in our briefs to you, Your Honor, that those support our position. I thought you had said earlier that you didn't argue these factors to the commission, that you didn't address the TEPA factors. No, we argued for the five, for one of them, Your Honor, ability to service debt. There is no information whatsoever on the record. It was absolutely impossible for anybody to argue that, for that reason alone. Where did you argue the TEPA factors to the agency? If we're talking about exhaustion, we need to see where you've done that. Again, Your Honor, we did not argue to the agency that it should apply the TPA or not. My colleague at the bar did. We did argue, though, as to those specific factual points. They were points that we made to the commission in our briefs in the agency below. With that, I'll reserve my time, Your Honors. We'll save you a little time there, but this is a critical aspect, it seems to me. Perhaps we can pursue it with Mr. Marshak. I'd like to talk about the merits of the case and why we believe that the commission's decision wasn't supported by substantial evidence. Did you argue the new TEPA factors to the agency? No. Well, we didn't argue them as being new factors. What we argued to the agency was that profitability was critical to the case. And what the agency said was, the domestic, and I'll quote from what the agency said, the domestic industry and each individual domestic producer were increasingly profitable during the POI. This is not unexpected. And that's all they said about profitability. And a major portion of our brief addressed the fact that during the POI, this industry was making record profits objectively as an industry and also compared to other industries. So it's operating profits, it's net profits, it's return on assets, it's return on investments. We're all going through the roof. Now, we didn't put that in the context of the new law, but we said, this is what the commission is required to look at. When you look at an industry, whether an industry is being injured, whether the harm is not inconsequential, immaterial, or unimportant, you have to look at the profitability of the industry. That's like a number one factor to look at, which is very, very critical. And we stressed that throughout our brief and to the agency and to this court. But we said, when the commission just said it wasn't unexpected, that alone makes the decision not supported in the nine and a quarter's rule of law. But it's true that the ITC also addressed at length the profitability question, right? No, we don't believe it did. Absolutely not, Your Honor. We believe the agency's- It addressed profitability? That was the problem. What the agency said was, one sentence, the domestic industry and each individual domestic producer were increasingly profitable during the POI. Absolutely true. And then they said, this is not unexpected during a period of increasing apparent U.S. consumption and declining more material costs for natural and synthetic rubber. Well, it probably isn't unexpected, but here we're talking about profits that were increasing, that were higher than comparative industries, that were record profits. I'll just quote from Goodyear's CEO when he's talking about what was going on in the market. The CEO of Goodyear, and this is the appendix page 2494, and he was going to say, I will tell you, in that market, we have stayed true to our North American strategy or our company strategy of staying focused on our targeted market segments, where we can maximize the value of the Goodyear brand. Even in that tough market, we haven't changed and said, hey, the markets grow and let's just sell more tires for volume for volume's sake. We haven't done that. And you see that in the record fourth quarter, and you see that in the record full year results. So you are managing it very well. What was going on in this industry was that the industry made a conscious decision not to chase market share. They were not chasing revenue. And what the agency said was that there was injury because there was lower revenues than otherwise would have had. So the International Trade Commission said the industry is being injured because the revenues are lower. But what the domestic industry was saying is we don't want to chase revenue. Our idea is not to chase revenue anymore. What we want to do is we want to increase our profitability. These are worldwide companies. They're not just making tires in the United States. These companies are producing tires throughout the world. So when we look at their tires, the agency said also they had capacity to make more tires. Well, they didn't have capacity to produce the tires they wanted to produce in the United States, the high value tires. And you look at every single one of these domestic producers, and what they're saying is we had good year. We have more demand for HP products than we can fill. Good year again, robust demand for HP tires, demand which in some cases exceeds our supply. Cooper, we're in the process of reconfiguring its manufacturing plan to increase production of these products. Toyo, our growth really is stunted by capacity. Bridgestone, expansion is intended to meet growing demand in key market segments, including ultra-high performance in light truck SUV tires. So what the domestic industry was doing in their worldwide production, they're importing the lower price, the tires that compete against the Chinese from third countries. And you have more tires being imported by domestic producers from third countries that are being imported totally from China. The domestic industry has rationalized worldwide production. They're profitable. They're looking at their long-term growth. And to do that, they don't want to increase revenue by producing inexpensive tires in your domestic facility. That's not healthy for the industry. It sounds like a fine argument to make to the commission, but it's not our job to second guess what they've decided. I realize that every time we have a case against the commission, we're always talking about reweighing the evidence. But I think it becomes a point where we're not talking about reweighing the evidence anymore. We're talking about looking at what the domestic industry really wanted to do. The domestic industry was not chasing revenue. And what the commission said is that because you have less revenue, you're being injured. And domestic industry says, we don't want that revenue. We want to make these low cost tires in third countries. That's not going to help our U.S. production. That's not going to make us healthy. What's going to make us healthy is to produce the high value tires in the U.S. where we don't have the capacity. We're expanding the capacity. And what the commission did is they ignored the statements of the CEOs. They just brushed off the fact that the industry was making record profits by saying this is not unexpected. And capacity, they just talked about, well, you had capacity, you had production, and there's excess. And for capacity, what the mistake they made was they looked at capacity figures that the union submitted, and it was based on a static production where when you look at capacity and capacity utilization, it changes. If you make more high value tires, your capacity to make individual tires declines. And the commission made these fundamental errors just by the way they looked at the industry and not considering what was good for the industry. I believe the commission substituted its judgment for the judgment of the corporate executives who made decisions which led Goodyear to say it had record yield. Thank you. We'll save you rebuttal time. Ms. McNamara. Good morning. Courtney McNamara on behalf of the United States International Trade Commission. This court should reject ITU-VOMA's and CRA's arguments and challenges to the commission's determinations, and it should- Is there a provision in the statute or the regulations that addresses exhaustion? I don't offhand know if there's a provision in the statute. I apologize, Your Honor. I'm happy to look that up. But I think that you're right. The court holds there is requirements for exhaustion. And I think that you rightly have noticed that they did argue the profitability. They didn't argue the TPEA. But this argument raises a lot of questions about what they're arguing and whether this has been properly presented. The Court of International Trade correctly noted that they could have made arguments, and the judge emphasized that they declined to make these arguments. And even though they conceded that they could have and should have, they had an opportunity to comment on the TPEA. And even though the staff report contained the prior statute, that is not controlling. Well, would you explain to us why it is that when there's a clear change of law, an explicit change of law known to everybody that affects what everybody is doing, that the commission can say, never mind, we're not going to follow it? Oh, no. That's not what the commission said at all. Excuse me, Your Honor. That's not what the commission said at all. What the commission did is- And you can see the staff report. The staff report is primarily the commission staff taking all of the record evidence, analyzing it, and distilling it into a single document. So that's a huge volume of record factual evidence. So the commission didn't say it wasn't going to apply that. It didn't say that at all. What it did was, while it's in the process of finalizing the staff report, the law changed, and the commission- Perhaps it erred in not changing the boilerplate, but that's not the role of the staff report. The staff report isn't to advise the parties of the law. The parties should know the law. The purpose of the staff report is to give a document that explains the analysis of the record evidence. It's a huge factual-based document. So the fact that the staff report had the incorrect law doesn't mean that the commission wasn't going to apply it. And the commission could not. It could not decline to apply the law. It had to. And it did so in the most reasonable manner. ITG FOMA, it did so in the most reasonable manner. It did so given the pressing statutory deadlines. The TPEA was enacted into law on June 29th, and the commission had a pressing deadline. This is the final stage of its investigation. And that deadline didn't move. The TPEA didn't give extensions. That deadline didn't move. So the commission acted in the most reasonable manner. It determined that it was going to apply- Didn't say much is the problem about the new TPEA factors. Well, but it did. It talked about the profitability. Well, it mentioned them. It mentioned them. But there's nothing in the TPEA that requires anything more. And that's- Before I move on to that point, I just want to briefly point out that in addition to the problems with exhaustion and the arguments, I just also want to point out that ITG FOMA is raising for the first time this idea that the commission should have obtained the evidence on the ability of the domestic industry to service debt. It is raised for the first time in the reply brief. They did not raise that in their opening brief, and they did not raise that before the Court of International Trade. That argument should be waived. What about the argument that the domestic producers really weren't interested in the low-cost variety, didn't injure them? Well, that's not what the record showed. The commission reasonably found that the record showed that they competed meaningfully against each other. In the low-cost market. Yes, absolutely, Your Honor. And although I understand counsel's characterization of them not chasing revenue, but companies are in the business to make money. They're even saying they're trying to maximize profitability. And if you look at the domestic industry here, the domestic industry did not cede the market share. They did not cede the lower market. They continued to participate in it. They continued to participate in the lower market by offering a wide variety of tires. And you can look at Appendix D1. It has the list of the different brands that they're offering. They're offering different brands at all the price points. But I think the argument is that the lower-priced tires were all manufactured abroad, right? No. I mean, that is the argument, but that's not what the record shows. And you can look. In particular, one of the biggest manufacturers on Appendix D1 self-identifies the tires that they're producing in the United States. The overwhelming majority are the ones that are being produced, not in the top tier, but in the secondary and the third tier. So those lower-value tires. That's one of the largest producers in the domestic industry said, the bulk of our market is going to those tiers. And the commission found that they were competing against each other. No matter how you define brand, the commission found reasonably that the domestic industry was serving all those aspects of the market. And they lost market share. So it doesn't make sense. The commission noted they have to be obtaining some of the growth because all the parties agree that the growth here is in the area of the higher-value tires. So if they're gaining market share, then they're necessarily participating in that growth. If they're confined to the lower tier of the market, how are they gaining market share? And even though I just—I'll turn to I.T. Giovanna's arguments. The commission's path here is, even though it didn't specifically address the rate of return on assets, the commission's argument is premised on a misreading and a conflation of the statute. Section B of the statute provides that the commission shall, in each case, consider the volume, price, and impact and explain its analysis with respect to those factors. Section B further provides that if the commission considers factors outside of that, it shall identify and explain the relevance of those factors. Section C provides that the commission shall evaluate certain enumerated factors, but nothing in Section C says anything about a level of analysis. And this court has said, as long as the path of the agency is reasonably discernible, determinations should be upheld. And here, the agency's path is clear. The domestic industry was profitable by every measure. There's no debate about that. And although the commission didn't specifically address the rate of return on assets, it explains in the staff report that that's a function of this profitable industry. There's no debate. They were a profitable industry. But notwithstanding that profitability, throughout the period of investigation, their shipments, their net values, their net sales values, net sales volumes, production, and employment all declined. And the domestic industry lost market share. So here, it's very clear. And as the court noticed, they haven't made any argument about how these new factors, undermine the commission's analysis at all. They point to their reply brief, and they say that they put the factors and the evidence from the staff report in a chart. But they haven't made any argument other than point to those factors. And the commission acknowledged those factors. All they are doing is, I mean, they haven't made any argument. The commission acknowledged that the domestic industry was profitable by every measure. But that doesn't mean they're not and excuse me, counsel has not articulated any way that the rate of return of assets or the profitability undermines the commission's determination. They were profitable. That's fine. They had a high rate of return on assets. Okay, but that doesn't mean they didn't lose market share. And it doesn't mean that they didn't experience all those declines and indicators. IDGBOMA and CRA, they're just seeking to substitute their judgment for that of the commission. They want to place decisive weight on these profitability factors. But that's contrary to law. The statute provides that the presence or absence of any factor is not precludes the commission from finding an industry not injured just because it's profitable. The court should reject these challenges. Oh, I just also want to briefly address IDGBOMA's argument that it didn't have a sufficient opportunity to comment on the TPEA because of commission rules. They are correct in now arguing that the commission rules prevent a party from raising new factual arguments, I mean new facts, but facts are distinct from legal arguments and nothing in the commission rules preclude a party from raising, you know, arguing about the probative value and making a legal argument. Oh, I guess that they thought there needed to be additional facts and whether the TPEA, they could have made a request to reopen the record. Absolutely, your honor. They could have made a request. The commission regulation 201.12 specifically provides that the parties can make a request at any particular time. You're absolutely right. They never did that. In fact, not even until the reply brief did this even come up. They've never requested that the commission seek additional data. So I've talked a little bit about the competition. The competition, the commission's findings on I also want to address the capacity. The commission's finding that the domestic industry had additional capacity is supported by substantial evidence. The commission observed that notwithstanding the, excuse me, the commission observed that as the rate of subject imports slowed from 2012 to 2013, excuse me, I'm sorry, let me start over. The commission reasonably found that the record showed that they had additional capacity. Subject imports surged into the market from 2012 to 2013 at the expiration of the safeguards, and they more than doubled their market share. The rate of imports slowed in 2014, and the commission found that the domestic industry's capacity utilization, as those surged in, the capacity utilization declined, and as the rate of the imports slowed in 2014, the capacity utilization increased. That, along with the additional questionnaires, along with the fact that in the safeguard investigation, they had achieved a substantially higher capacity utilization rate, all is evidence, substantial evidence, that they had additional capacity from which they could have produced more tires and obtained greater sales. So, I see, and also just with respect to non-subject imports, council contends that they would not have, that they just turned to subject imports. The record belies that. Table 3.9 shows the domestic industry's imports, and as we point out in our brief, when the rate of subject imports slowed, the volume of non-subject imports increased only incrementally, while the production and the shipments of the domestic industry actually increased at a greater rate. So, in conclusion, neither ITG Vomit nor the CRA have provided any legitimate legal or factual basis for this court to disturb the lower court's judgment, and this court should affirm the lower court's holding and sustain the commission's determinations in every respects. Thank you. Okay, thank you. Mr. DePrest, you have three minutes. Good morning, your honors. May it please the court, I would just like to address a few of the questions that came up. First of all, about the supposed abandonment by the domestic industry of lower value tires or lower tiers in the market, arguments like that. I would like to point out that there is lots of evidence to the contrary in the record, for example. In the hearing transcript, which is this particular section that I mentioned, is found at page 2120. Mr. Mangola, who was a witness for the respondents, said that, no, I think that certain manufacturers, like we've mentioned, they're very interested in competing more in the value segment of the market, the third tier of the market, and that's the reason why you see a lot more of the Kelly brand etc., etc. And then he says, Goodyear is manufacturing tires, Kelly tires play, to specifically play in their value line market, and then he talks about Cooper, etc., etc. So there is no question that the domestic producers were very, remained very, and always were, very interested in competing in the low end of the market. And then also in the transcript, there's, on the hearing transcript, 1873 to 1875, where a witness, a union witness, is describing efforts by Michelin to recapture lower value parts of the market. And then at 1878 and 1879, it describes the efforts of Goodyear to do the same thing. With regard to the same issue, I would also like to point to, there was a lot of briefing on this, to the response that was given by the petitioners to Commissioner Broadbent, where discussing tiers and supposed tiers in the market. And as you know, from what the commission concluded, there was very little agreement on what exactly, which tire belonged in what tier. But apart from that, what the answer to Miss Broadbent makes clear is that the tiers were really there, every dealer stocks a large number of brands. And I think there's a quote someplace which I can find, that on the average, every dealer had 11 different brands in their shop, right? So the idea is that it's a good, better, best kind of marketing strategy. So if a customer comes in the shop and is looking for tires, then you can improve your profits. If you can say, well, you're interested in this tire, well, we have this other one, which is a bit better, lasts a bit longer, why don't you take this one into consideration? Or if the customer believes, well, you know, that's kind of a lot of money, then you can, you know, sell them a cheaper one. And this is not just for tires. Many products have the same marketing strategies that are, you know, used. It doesn't mean that there's somehow a lower tier or a higher tier segment, and the higher tier segment is insulated from competition. You know, that is simply not the case. And then, if I may, on the subject of TPEA. Is there an exhaustion provision in the statute or the regulation? I, you know, I was thinking about that, and I can't think of one. I think it's from, but I could be wrong. The statute on the material injury factors, and this is pointed out in Ms. McNamara's brief, it says, it lists all these factors and it says, before listing it, including but not limited to. Including but not limited to. So the statute tells you exactly, these aren't, this is not an exhaustive list. You can come up with lots of other things. And so, since profit was an issue from day one in this investigation, since the industry was profit, everybody, everybody, including our client, did his utmost best to talk about profit. Now, of course, they had a different We tried to minimize it, right? So we talked about, we submitted the study in the, in our pre-hearing brief, where we talked about the industry's ability to earn back its cost of capital. Okay? That same, that's not a listed factor. Everybody had the same opportunity. And to come up at the very last moment, in court briefs, with a fabricated deus ex machina kind of argument, that somehow or another they did not have an opportunity to argue this, is simply implausible. People did argue whatever they could about the profit issue, and that is the only thing that really is important. And the commission took these arguments into account, including our argument, and found, as it did, placing profit in the context of the conditions of competition and in the context of, you know, the other factors that it observed. Okay, thank you. Okay, Mr. Stroh, you saved two minutes. Your Honor, there's a black letter law that when Congress amends a statute, it is presumed that Congress, quote, intends its amendment to have a real and substantial effect. Do you have a site for me where you raised this? Yes, Your Honor. The site, Your Honor, is U.S. versus Quality Stores Inc. In the record here, where did you raise the TEPA issue before the agency? Your Honor, as I said, we did not raise the TEPA. We did, however, address four of the factors that Congress added. We addressed the three profit factors actually in two places, Your Honor, at Appendix 4088 and 4108. My colleague at the bar addressed the fourth factor, Your Honor, the return on assets at Appendix 4118. As we've said, Your Honors, for the fifth factor, the ability to service debt, there was no information on the record. For that reason alone, Your Honor, this case should be remanded for further consideration. I object to my counsel's intimation that we never raised this issue. We asked this court and the court below to remand to the commission for further consideration. That includes making a decision of whether to open the record when there's no information on the record about a particular factor that was enumerated by the Congress. But you never asked to reopen the record before the agency, right? No, Your Honor, we did not. As I've said, this issue, the statute was passed on June 29. Final comments, as I've said, were due on July 2nd. I disagree with my colleague at the bar. I believe that you're only allowed to make comments on the factual record. You're not allowed to raise new legal arguments for the first time in your papers. However, if that is not the position of the commission, I would point out that the other side did in fact raise the question of whether the TEPA should be applied. I think in that respect, Your Honor, this falls directly within the exception to the exhaustion record. Where did they raise that? They raised it in their final comments, Your Honor, in a footnote. There's an exception to the exhaustion doctrine. What page of the record do we see that? I believe, Your Honor, that the commission discussed it in its footnote 245. I'm not talking about the commission addressing it. I'm talking about you or your co-counsel addressing the issue and asking that the commission address the issue. Your Honor, we did not address the issue. However, my counsel at the bar in a footnote in its final comments did in fact address the issue and the commission admits this. It admits this in the one place in the record in which it acknowledges that it's going to apply the TEPA in a very cursory footnote. I don't believe, as I've said, Your Honor, that they addressed the enumerated statutes, the enumerated new factors, enumerated by Congress, not by me or by the commission, or that they gave any explanation of how they were going to apply it. For that reason, Your Honor, we respectfully request that the commission's decision be reversed and remanded. Thank you. Thank you. Okay, Mr. Marshak, you have one minute. You will have to talk fast. I always talk too fast, Your Honor. I think the government counsel talked about what the case was about from the International Trade Commission's viewpoint. And what counsel said, that the domestic industry had capacity to produce more tires and obtain greater sales. And that's the crux of the commission case. And the crux of our case is they did not want to do that. Obtaining greater sales is not what domestic industry and domestic industry, I'm talking about companies producing tires in the United States. We have great respect for the unions, but wages or employment are critically important. But the companies producing tires in the United States during the POI, Bridgestone and Michelin and Goodyear and Cooper, they did not want to chase market share. They were not chasing revenues. They had gone through difficult times. It was a 421 case. And what they did was they rationalized worldwide production. And to do that, the idea was to make the high value, expensive tires in the United States and Europe to sell to these high cost countries. The more high cost, high value tires to sell to the United States, the more profitable they'd be. And what they would do is they left for their third country markets. Yes, there were a lot of third country tires. Michelin was in the third country. Goodyear was in the third country. They were producing, they were importing your tier three tires from their third countries. Third country tires, you had twice as many imports as you had Chinese imports. And you had more imports by domestic producers from the third countries than you had from the Chinese. So what the domestic industry wanted to do was to not chase revenue, not obtain greater sales, but obtain more profitable sales in the high value tires. And they put capacity in the United States to do that. And because of that, they had a record year in 2014. And their profitable, longstanding growth, good growth, profitability, and this is their one where they want to be. And because of that, they were not injured. Thank you. Okay, thank you. Thank you all. The case is taken under submission. Transcribed by https://otter.ai